# Supreme Court of Louisiana

FOR IMMEDIATE NEWS RELEASE

NEWS RELEASE #037

FROM: CLERK OF SUPREME COURT OF LOUISIANA

The Opinions handed down on the **31st day of July, 2026** are as follows:

**PER CURIAM:**

2026-CD-00927
JOHN T. FULLER  VS.  STATE OF LOUISIANA; JEFF LANDRY IN HIS OFFICIAL CAPACITY AS GOVERNOR; ELIZABETH B. MURRILL, IN HER OFFICIAL CAPACITY AS ATTORNEY GENERAL; NANCY LANDRY, IN HER OFFICIAL CAPACITY AS SECRETARY OF STATE; AND CHELSEY RICHARD NAPOLEON, IN HER OFFICIAL CAPACITY AS CLERK OF COURT FOR THE PARISH OF ORLEANS (Parish of East Baton Rouge)

STAY LIFTED. INJUNCTION LIFTED. REVERSED AND RENDERED. SEE PER CURIAM.

Weimer, C.J., dissents and assigns reasons.
McCallum, J., additionally concurs and assigns reasons.
Griffin, J., dissents and assigns reasons.
Guidry, J., dissents and assigns reasons.
Cole, J., additionally concurs and assigns reasons.
Burris, J., additionally concurs and assigns reasons.

No. 2026-CD-00927

JOHN T. FULLER

VS.

STATE OF LOUISIANA; JEFF LANDRY IN HIS OFFICIAL CAPACITY AS GOVERNOR; ELIZABETH B. MURRILL, IN HER OFFICIAL CAPACITY AS ATTORNEY GENERAL; NANCY LANDRY, IN HER OFFICIAL CAPACITY AS SECRETARY OF STATE; AND CHELSEY RICHARD NAPOLEON, IN HER OFFICIAL CAPACITY AS CLERK OF COURT FOR THE PARISH OF ORLEANS

On Supervisory Writ to the 19th Judicial District Court,
Parish of East Baton Rouge

**PER CURIAM**

This matter presents the question of whether Act 748 of the 2026 Regular Session ("Act 748") was constitutionally enacted. For the following reasons, we conclude the legislature validly enacted Act 748, reverse the trial court's judgment declaring the Act unconstitutional, and vacate the preliminary injunction against it.

**BACKGROUND**

Orleans Parish has long maintained a unique judicial structure among all parishes in the state, as it has separate civil and criminal courts. The framers of the 1974 Constitution preserved that distinct structure in La. Const. Art. V, § 32, while making the enumerated Orleans Parish courts and offices "subject to change by law," notwithstanding any contrary constitutional provision. *Id.*

Section 32 reflected cognizance of the fact that the courts of Orleans Parish were conceived in a different era, when New Orleans was much larger than any other place in the state. A useful historical perspective is gained by contemplating the shift away from Orleans Parish, even within its own region. That change was in its infancy at the time of the constitutional convention but accelerated rapidly in the years

1

following adoption of the 1974 Constitution. In 1960, the population of New Orleans reached its peak of more than 600,000 residents. In the decades that followed, the population of the city itself declined as surrounding parishes experienced substantial growth. The New Orleans metropolitan statistical area, together with part of the Northshore, comprises nearly 1.3 million people, while the 2025 census estimate places the current population of Orleans Parish at 362,154. There were times in history when Orleans Parish approached a quarter of the state's population, now it comprises barely a quarter of the New Orleans region.

During the legislative debate over Act 748, state leadership expressed a desire to address the disparity between the state funding spent on the judiciary in Orleans Parish compared to the rest of Louisiana. The opening address called for reform by highlighting that more than double was spent by the state in Orleans Parish compared to East Baton Rouge Parish, the state's most populous parish with its busiest court.

Act 748 of the 2026 Regular Session, signed on June 3, 2026, made changes to the Orleans Parish courts. Among other changes, the Act abolishes three judgeships on the criminal district court by abolishing Sections A, E, and J at the conclusion of the incumbents' terms. The Act further provides that no further elections will be held for those abolished judgeships. *See* La. R.S. 13:1335(A)-(B).

Even after implementation of Act 748, Orleans Parish retains the most judges in the state, including more than those judicial districts with more cases and larger populations.[1] Act 748 reduced the number of general trial judges in Orleans Parish from 27 to 24, still 50% more judges than in Jefferson Parish, its larger neighbor.[2]

---

[1] The Legislature's consideration of Act 748 occurred against a backdrop of fiscal and administrative concerns. Publicly reported caseload statistics provide administrative context. The Louisiana Supreme Court's 2025 Annual Report reflects that the Nineteenth Judicial District Court in East Baton Rouge Parish, with only 15 judges, reported more than double the combined filings of the Orleans Parish courts. *See* 2025 La. Sup. Ct. Annual Report, p.47, *available at* https://www.lasc.org/press_room/annual_reports/reports/2025_ Annual_Report.pdf.

[2] Orleans Parish retains 14 trial judges in civil district court and ten judges in criminal district court, which is comprised of nine judges and one elected magistrate judge. There are additionally four appointed commissioners in the criminal district court that are not counted in this total.

Plaintiff, Judge John Fuller, was elected to Section J on May 16, 2026, and retains that seat through the expiration of the term on December 31, 2026. Had Act 748 not abolished Section J at the end of his term, Judge Fuller intended to run again.

On June 29, 2026, Judge Fuller filed this lawsuit seeking a declaratory judgment, preliminary and permanent injunctive relief, and, alternatively, a writ of mandamus. Judge Fuller's principal contention was that Act 748 required the approval of two-thirds of the elected members of each house under La. Const. Art. V, § 15(D), which is applicable to district courts generally, and he argues that it should also govern here. He also argued that La. Const. Art. V, § 32 applied to those courts and offices named in it, like the clerk of court, but did not apply to the judges of those named courts. Judge Fuller asserted that change may be enacted under Section 32 for the criminal district court as a whole or as an entity, but that it does not authorize change to individual judgeships by ordinary legislation.

Because the conference committee report received 25 votes in the 39-member Senate and 62 votes in the 105-member House, Judge Fuller alleged that Act 748 did not pass by the constitutionally required margin. In the alternative, his petition asserted claims based on the right to vote, equal protection, and the constitutional prohibition against local or special laws. He requested relief preserving the abolished sections for the August 2026 qualifying period and the November 2026 election.

The state filed an opposition to the requested injunction, a dilatory exception of unauthorized use of summary proceeding, and peremptory exceptions of no cause of action and no right of action. In short, the State argued that Act 748 was a valid exercise of the Legislature's authority under Article V, § 32, and that Judge Fuller's requests were procedurally barred.

---

Effective January 1, 2027, Orleans Parish also retains 12 judges serving on its courts of limited jurisdiction: three in Juvenile Court following abolition of Section F, five in Municipal and Traffic Court following the abolition of Divisions B and F; and four judges in the First and Second City Court, who were unaffected. An additional juvenile judgeship and municipal judgeship are designated for recission at their next vacancy. La. R.S. 13:1595(B) and 13:2492 (A)(8).

Following a hearing on July 14, 2026, the trial court signed a judgment granting a preliminary injunction in Judge Fuller's favor. The court declared Act 748 "null and void," concluding that La. Const. Art. V, § 32 did not apply to the abolition of the criminal district court sections and the Act had not received the supermajority vote required by La. Const. Art. V, § 15(D). The court refused to hear the State's exceptions. The judgment directed the Orleans Clerk of Court to receive and preserve provisionally any qualifying papers tendered for the abolished judgeships and prohibited the Secretary of State from taking final or irrevocable action omitting those offices from the November ballot.

The State sought a suspensive appeal pursuant to La. R.S. 13:4431 and requested that the injunction be suspended in all respects during that appeal. No order granting the appeal had been signed when Judge Fuller filed an emergency writ application directly in this Court, requesting that we assume plenary supervisory jurisdiction and that we resolve the constitutional question before the period for qualifying opens.

Given the compressed timeline due to the upcoming election qualifying dates and the statewide importance of the constitutional question, this Court assumed supervisory jurisdiction and stayed the proceedings below. *John T. Fuller v. State of Louisiana, et al.*, 26-0927 (La. 7/17/26), --- So. 3d --- (2026 WL 2105672).

## DISCUSSION

In the interests of judicial economy and to provide a definitive resolution before the opening of the election qualifying period, we exercise our plenary supervisory authority under La. Const. Art. V, § 5(a). The "[s]upervisory authority of this court is plenary, unfettered by jurisdictional requirements, and exercisable at the complete discretion of the court," regardless of whether lower courts have acted. *Marionneaux v. Hines*, 05-1191, p. 4 (La. 5/12/05), 902 So. 2d 373, 376. Pursuant to that authority, we decide the underlying constitutional question notwithstanding

4

certain procedural errors committed by the trial court, discussed further herein. Review of a judgment determining the constitutionality of a statute presents a question of law to be reviewed *de novo*. *See Fisher v. Harter*, 24-0359, p. 5 (La. 10/25/24), 395 So. 3d 806, 811. Statutes are presumed constitutional, and the party challenging the statute has the burden of proving its unconstitutionality. *Id.*[3]

Importantly, the parties agree the trial court's order was overbroad insofar as it declared all of Act 748 "null and void." Judge Fuller challenged only the provisions related to criminal district court judgeships, specifically Act 748's abolition of Sections A, E, and J, its bar on qualifying and the implementation of its provisions, and its application to the November 3, 2026, elections for those sections. *See* La. R.S. 13:1335(A)-(B), 13:1343(A), 13:1383.

## I. Act 748 Was Validly Enacted and La. Const. Article V, § 32 Is Controlling

The Court's role in construing a constitutional provision is to determine and give effect to the intent of the people of Louisiana who adopted it. *Radiofone, Inc. v. City of New Orleans*, 630 So. 2d 694, 698 (La. 1994). When the constitutional text is clear and its application does not produce absurd consequences, it must be applied strictly as written. *Id.*

Two provisions of Article V of the Louisiana Constitution are relevant to this case. Section 15(D) provides:

> (D) Number of Judges. The legislature may change the number of judges in any judicial district by law enacted by two-thirds of the elected members of each house.

However, Section 32, the provision particular to Orleans Parish, provides:

> Except for provisions relating to terms of office as provided elsewhere in this Article, and ***notwithstanding any other contrary provision of this constitution***, ***the following courts*** and officers in Orleans Parish ***are continued***, ***subject to change by law; the civil and criminal district courts;*** the city, municipal, traffic, and juvenile courts; the clerks of the civil and criminal district courts; the civil and criminal sheriffs; the

---

[3] Because we have exercised plenary jurisdiction over the constitutionality of the Act, a discussion of defendants' remaining exceptions is pretermitted.

5

constables and the clerks of the first and second city courts; the register of conveyances; and the recorder of mortgages.

(Emphasis added.)

The phrase "notwithstanding any provision of law to the contrary" is a well-established term signaling that the statute or provision containing the phrase takes precedence. Antonin Scalia and Bryan A. Garner, *Reading Law: The Interpretation of Legal Texts*, § 13 (2012). The Supreme Court of the United States has also recognized the principle that "the use of such a 'notwithstanding' clause clearly signals the drafter's intention that the provisions of the 'notwithstanding' section override conflicting provisions of any other section." *Cisneros v. Alpine Ridge Group*, 508 U.S. 10, 18 (1993).

In *Davenport v. Hardy*, 349 So.2d 858 (La. 1977), when interpreting Section 32 of the Louisiana Constitution, this Court held that "the Constitution generally establishes the Legislature's power to govern [office(s) under § 32]. ***It imposes no limitations or restrictions on the exercise of that power***[.]" *Id.* at 863 (emphasis supplied). The courts and officers enumerated in Section 32 were placed under the legislature's plenary authority and made "subject to change by law," meaning "the normal legislative majority vote," notwithstanding other constitutional provisions. *Crockett v. State*, 26-0594, pp.3-5 (La. 6/1/26), --- So. 3d --- (2026 WL 1599484).

Judge Fuller accepts the holding of *Crockett*, that Section 32 authorizes the legislature to make changes concerning the listed officers and even the listed courts. He contends, however, that Section 15 still governs any change to the number of judges and thus that issue requires a supermajority vote. That argument is unavailing.

Orleans Parish has long maintained a unique court structure. *Id*. As part of the compromises leading to the 1974 Constitution, the Convention continued this "anomalous structure with numerous extra offices and judges compared to the rest of the state" but "affirmatively rejected attempts to protect them into the future." *Id.*

6

A plain reading of La. Const. Art. V, § 32 establishes the constitutionality of Act 748. The "civil and criminal district courts" of Orleans Parish are expressly governed by Section 32 and made "subject to change by law." *Id*. *See also State v. Francois*, 445 So. 2d 416, 418 (La. 1983) (reiterating the legislature's "plenary power" over the Orleans Parish courts which "the legislature may completely abolish, partially erase or otherwise change"). Section 32 identifies only one exception to that authority which we identified as La. Const. Art. V, § 21 and it is not implicated here. *Id.*

Judge Fuller contends the two provisions can be harmonized because Section 32 authorizes the legislature to change the Orleans Parish courts, but not their judges.[4] He describes this as "who" can make the change as opposed to "how" the change must be made. That distinction is unpersuasive. By making the Orleans Parish civil and criminal district courts "subject to change by law," Section 32 prescribes ordinary legislation as the mechanism for making those changes. The supermajority requirement in Section 15(D) therefore conflicts, and must yield to, the regular majority vote mechanism applicable under Section 32.

That conflict is clearly resolved by the "notwithstanding" clause of Section 32. "[T]he catchall *notwithstanding* is a failsafe way of ensuring that the clause it introduces will absolutely, positively prevail." Scalia & Garner, *Reading Law,* § 13 at 127. The authority over the "courts" granted to the legislature in Section 32 cannot be severed from its authority over the judges who constitute those courts. This Court has recognized that Section 32 permits the Legislature to "completely abolish" statutory provisions concerning this court. *Francois*, 445 So. 2d at 418. Judge Fuller's interpretation would produce the incongruous result that the legislature

---

[4] Paragraph B of La. Const. Art. V, § 15 applies to other district courts by continuing then-existing courts and providing parameters governing their merger. Even Judge Fuller's brief agrees this paragraph would not apply to restrict a court merger in Orleans Parish. But that exposes an obvious inconsistency in his argument: why should one paragraph of Section 15 apply to restrict the legislature if, as we all agree, the other does not?

could abolish the court by ordinary legislation, impacting all judges, yet cannot reduce that court by three judgeships without a two-thirds vote.

The text of Section 32 is clear and that answers this inquiry. Nevertheless, Judge Fuller points to certain records of debate from the constitutional convention to support his argument. He correctly observes that the convention debate centered on merging the civil and criminal district courts. But it is incorrect to divine from that debate a principle that places New Orleans under the same provisions as other courts for every purpose *except* mergers.[5] That is not what our Constitution says, and therefore not what it does.

The dissenting justices also rely on philosophical platitudes and a law review article while totally ignoring the salient provision of the Constitution specifically directed at the legislative power concerning the Orleans Parish judiciary. If the legislative authority under Section 32 can only be used pursuant to the other provisions of the Constitution, then there is no reason for the "notwithstanding" clause. It would be totally superfluous. The reality glossed over by the dissents, presumably because there is no answer other than the obvious one, is that the legislative authority under that Section existing "notwithstanding any other contrary provision of this constitution" means exactly that.

This Court has long recognized that convention debates "cannot be resorted to for the purpose of varying the otherwise clear and unambiguous meaning of a constitutional provision." *Succession of Lauga*, 624 So. 2d 1156, 1165 (La. 1993). In any event, the final actions taken by the delegates through their votes speak louder than the reasons debated. Here, the delegates voted to delete from the draft of Section 32 a proposed provision imposing a two-thirds supermajority requirement on the legislature's authority under that Section. *Id.* The dissenting justices and Judge

---

[5] It is similarly wrong to assume that because certain examples related to courts of limited jurisdiction that the provision only applies to those courts when all Orleans Parish courts are listed.

Fuller *would have us ignore the clear text of the Constitution to impose a restriction on the legislature that the delegates expressly voted on and rejected*.

The text of our Constitution continued the Orleans Parish civil and criminal district courts "subject to change by law," made that legislative authority controlling "notwithstanding any other contrary provision of this constitution." That was what was placed before the people of Louisiana and adopted by them; therefore, the people of Louisiana exclusively vested the decisions concerning these courts to the legislative majority they elect to represent them.

## II. Act 748 Is Not a Local Law and Is Valid Under Plaintiff's Under Theories

The petition also asserted claims based on the right to vote, equal protection, and the constitutional restrictions concerning the passage of local or special laws. Those claims are not emphasized before this Court, and, in any event, provide no alternative basis for sustaining the preliminary injunction.

As to the local law claim under La. Const. Art. III, § 13, this Court has already recognized the "longstanding view that all laws concerning the state's courts and judicial officers such as clerks, even if limited in scope, are matters of statewide importance and general concern. They are not local laws regardless of geographic remit." *Crockett*, 26-0594, p. 4 n.1, --- So.3d at ---. The three dissenting justices attacked that widely understood principle with one justice even stating it lacked any supporting authority. Their conclusion would have dangerous and far-reaching consequences, likely invalidating many hundreds of laws concerning the operation of every trial court in Louisiana.[6] This illustrates the instability that results when courts fail to follow well settled law to advance erroneous arguments arising from an otherwise sympathetic cause or sensitive case.

---

[6] A substantial portion of Title 13 of the Louisiana Revised Statutes of 1950, as amended, is customized to particular courts but was adopted without local advertisement.

In any event, that approach was not merely dangerous, it was also wrong. Our *jurisprudence constante* has held for over 140 years that a statute is not local or special merely because its immediate operation is geographically limited when it concerns a subject "in which the people at large are interested." *Polk v. Edwards*, 626 So. 2d 1128, 1133-35 (La. 1993) (explaining that a law is not "a local law because it can only operate in a particular locality . . . if the legislation is general rather than local or special, neither the prohibitions regarding the enumerated subjects nor the requirement for local advertisement apply"). The *Polk* Court noted that this principle was "long recognized," *citing inter alia, State v. Dalon*, 35 La. Ann. 1141, 1143-44 (La. 1883) and *State ex rel. Grosch v. New Orleans,* 211 La. 241, 29 So.2d 778 (La. 1947).[7]

In *Dalon*, there was a challenge to the Act creating the Orleans criminal district court, **the very court at issue here**, on the basis that it was a local law. This Court rejected that claim out of hand, concluding that laws involving courts are not local but "a general act, which regulates the common good." *Id.* at 1142. The Court further explained: ***"The argument, that a law which relates solely to the machinery of a court of justice having jurisdiction over the territory of one parish only, is a local or special law,*** because it does not operate throughout the State and all the parishes thereof, ***is perfectly preposterous, and so hollow that it cannot stand criticism***." *Id.* at 1143-44 (emphasis supplied). *See also Polk* at 1135.

Act 748 concerns the judiciary and therefore does not constitute a local or special law merely because its immediate operation is confined to Orleans Parish. Plaintiff's claim under La. Const. Art. III, sec. 13 is without merit.

---

[7] This Court has long held that laws concerning courts are general laws. The legislature has regularly acted in conformity with, and relied upon, that consistently reiterated view.

10

## III. The Preliminary Injunction Was Procedurally Improper

Our holding that Act 748 is constitutional requires dissolution of the preliminary injunction. We nevertheless feel constrained to address the trial court's decision to declare the Act unconstitutional during a preliminary injunction hearing.

Louisiana Code of Civil Procedure article 855.1 requires that "[a]ll civil actions alleging that a law is unconstitutional shall be in writing and be brought in an ordinary proceeding." A hearing on an application for preliminary injunction, by contrast, is a summary proceeding, in which certain formalities of an ordinary action do not apply, and proof may be taken on verified pleadings or supporting affidavits. La. C.C.P. arts. 2591, 3601, and 3609. Because a declaration of unconstitutionality "[i]s in effect a ruling on the merits," such a declaration rendered during a preliminary injunction proceeding exceeds "the limited legal issues regarding the preliminary injunction," absent the parties' agreement to submit the merits for decision. *Herman, Herman, Katz & Cotlar, L.L.C. v. State ex rel. Blanco*, 08-1337 (La. 9/19/08), 990 So. 2d 737, 738. *See also Calhoun v. Landry*, 25-00316, p. 5 (La. 3/18/25), 403 So. 3d 521, 529 (Cole, J., concurring).

The trial court's declaration that Act 748 was "null and void" therefore exceeded the permissible scope of the preliminary injunction hearing. Considering the holding of this opinion, Judge Fuller cannot establish a likelihood of success on his constitutional claim; therefore, the preliminary injunction must be dissolved.[8]

## CONCLUSION

For the reasons assigned, the provisions of Act 748 that prospectively abolished three sections of Orleans Parish criminal district court did not require a

---

[8] Judge Fuller observes that his petition was filed as an ordinary declaratory proceeding. But the preliminary injunction hearing itself remained a summary proceeding, and the parties did not agree to submit the constitutional merits for final adjudication at that hearing.

The record also establishes some confusion in the trial court and an undue delay in it granting the state's appeal. In these circumstances the state had a clear right to an immediate suspensive appeal under La. R.S. 13:4431, and that appeal order should have been granted without delay.

supermajority vote, and the challenged provisions of Act 748 of the 2026 Regular Session were constitutionally enacted. The July 15, 2026, judgment of the trial court granting a preliminary injunction and declaring Act 748 "null and void" is vacated. Judgment is rendered in favor of defendants and Judge Fuller's claims are dismissed.

Considering the impending election and the need for finality, any rehearing application in this matter shall be filed no later than 10:00 a.m. Monday, August 3, 2026.

**STAY LIFTED. INJUNCTION LIFTED. REVERSED AND RENDERED.**

# SUPREME COURT OF LOUISIANA

## No. 2026-CD-00927

## JOHN T. FULLER

## VS.

## STATE OF LOUISIANA; JEFF LANDRY IN HIS OFFICIAL CAPACITY AS GOVERNOR; ELIZABETH B. MURRILL, IN HER OFFICIAL CAPACITY AS ATTORNEY GENERAL; NANCY LANDRY, IN HER OFFICIAL CAPACITY AS SECRETARY OF STATE; AND CHELSEY RICHARD NAPOLEON, IN HER OFFICIAL CAPACITY AS CLERK OF COURT FOR THE PARISH OF ORLEANS

### *On Supervisory Writ to the 19th Judicial District Court, Parish of East Baton Rouge*

**WEIMER, C.J.**, dissenting.

Article V, § 15(D) of the Louisiana Constitution clearly states that "[t]he Legislature may change the number of judges *in any judicial district* by law enacted by *two-thirds* of the elected members of each house." (Emphasis added.) Unlike the majority, I find this provision necessarily applies to courts in Orleans Parish, making Act 748—which eliminated three judge seats in Orleans Criminal District Court by fewer than two-thirds of the elected members—unconstitutional. Thus, I must respectfully dissent.

Judges are called on daily to make challenging decisions based on the law or on the Constitution. Occasionally, applying the law as written can be unpopular; but partisanship, personalities, or popularity should not affect the judge's decision. Unfortunately, judges are all too often faced with undue criticism for applying the law as written—not only from citizens, but from the government as well.

One of the grievances against King George III that led to the founding of our nation over 250 years ago was that judges were adversely affected by the shifting

1

winds of politics. This grievance is reflected in the Declaration of Independence: "He has obstructed the Administration of Justice, by refusing his Assent to Laws for establishing Judiciary powers. He has made Judges dependent on his will alone, for the tenure of their offices, and the amount and payment of their salaries." Today, the Louisiana Constitution contains that protection of judges in Article V, § 15(D).

Article V, § 15(D)'s requirement of a two-thirds vote in both legislative houses serves a myriad of purposes. A supermajority vote serves to protect judicial independence and hinders political elimination of judicial seats. The difficulty in removing judge seats from a judicial district keeps the judiciary equal in power to the legislative and executive branches. Since judges in Louisiana are elected by the people of this state, a supermajority prevents the legislature from nullifying the vote of the people. The supermajority is also a safeguard against political partisanship, since it would require a consensus among the political parties to either add or subtract judge seats from a judicial district.[1]

The implementation of a two-thirds majority vote in both legislative houses was not arbitrarily written into Article V, § 15 (D). It was adopted from Article VII, § 34 of the 1921 Constitution, which provided that "[t]he Legislature may rearrange the judicial districts, and by a two-thirds vote of the membership of each house, may increase or decrease the number of judges in any district." This court interpreted that prior article to mean two-thirds of the members elected to each house

---

[1] The requirement for a two-thirds vote is not designed to protect individual judges, but to ensure separation of powers and judicial independence. There are numerous protections built into our system of justice if a judge errs. The decision may be appealed to the courts of appeal and then a writ can be taken to the Supreme Court. All judges face the electorate periodically and can be voted out of office. The Judiciary Commission, a separate constitutionally established body, can evaluate violations of the Code of Judicial Conduct by a judge who could face discipline or removal from office. But judicial independence is such an important concept in our democracy that a super majority vote is constitutionally required to prevent a particular judicial seat from being eliminated.

must vote affirmatively to either increase or decrease judge seats within any judicial district in this state. See **State ex rel. Garland v. Guillory,** 166 So. 94, 102 (La. 1935). During the Constitutional Convention of 1973, there was substantial debate over whether the divided structure of the Orleans Parish judicial districts should continue, or whether it should be restructured to resemble the other judicial districts of the state. Attempts at exempting the Orleans Parish judiciary from the protections of Article V, § 15 failed. Records of the Louisiana Constitutional Convention of 1973, Transcript Records, volume VI, pp. 786-89, August 17th, 32nd Day of the Proceedings. The intent of the framers of the Constitution was, therefore, to have the Orleans Parish judiciary protected by Article V, § 15(D), evidenced by the absence of a clear exemption from a supermajority vote with respect to Orleans Parish judges in the constitution.

Article V, § 32 does not address changes to the number of judges in a judicial district; rather, it allows the Orleans Parish Civil and Criminal District Courts to continue to exist, "subject to change by law." Article V, § 32 was written into the Constitution because the framers could not agree to the restructuring of the Orleans Parish justice system and, therefore, compromised by allowing the Orleans Parish system to remain separate, but susceptible to restructuring in the future through a legislative act rather than a constitutional amendment.

The Constitution of Louisiana is the basic, fundamental law of our state emanating from the citizens of Louisiana. As the fundamental law of our state, it must be read as the primary body of law for our state. It is also a fundamental principle that all constitutional provisions must be read *in pari materia*, i.e., each provision must be read along with the other provisions and with the document as a whole, with each provision given meaning. See **Caddo-Shreveport Sales & Use**

3

**Tax Comm'n v. Office of Motor Vehicles,** 97-2233, p. 11 (La. 4/14/98), 710 So.2d 776, 782. Thus, Article V, § 15(D) must be read *in pari materia* with Article V, § 32 to determine whether Act 748 passes constitutional muster. Article V, § 15(D) does not "override" Article V, § 32, as the majority holds; the two constitutional provisions complement one another. While Article V, § 32 may be effective "notwithstanding any other contrary provision of [the Louisiana Constitution]," it is not contrary to Article V, § 15(D).

The power to alter the number of judges in a judicial district is not located in Article V, § 32. The phrase "subject to change by law" in that provision does not give the legislature the power to circumvent other constitutional provisions. Professor Lee Hargrave made an in-depth analysis of Article V, § 32, wherein he stated, "the grant of power to the legislature to 'change by law' related to change in the continuation of the existence of the separate courts, and not a general legislative power to change all aspects of the Orleans district courts." Lee Hargrave*, The Judiciary of the Louisiana Constitution of 1974*, 37 La.L. Rev. 780 (1977).

This court's earlier opinions in **Davenport v. Hardy**, 349 So.2d 858 (La. 1977), and **State v. Francois**, 445 So.2d 416 (La. 1983) establish that Article V, § 32 gives the Legislature plenary authority "to govern" the offices enumerated in the provision; however, **Davenport** is clear that Article V, § 32 does not give the Legislature power over what is not enumerated or what is expressly excluded, such as terms of office. **Davenport,** 349 So.2d at 863. Although Article V, § 32 mentions the civil and criminal district courts, it is silent as to the judges, where it specifically enumerates the sheriffs, clerks, constables, and other offices. That distinction is significant, because Article V, § 15(D) specifically addresses the

4

number of *judges* in *any* judicial district, which can only be modified by a two-thirds majority vote in both houses of the Legislature.

Similarly, **Francois** reinforces the constitutional "separation between the civil and criminal courts in Orleans Parish. But [Article V, § 32] also reserves to the legislature the plenary lawmaking power to change this division by law." **Francois, 445 So.2d at 418.** Again, **Francois** does not state that Article V, § 32 grants the legislature plenary authority over any judge; it only states that the legislature has plenary authority to change the *division* between the two district courts through enacted legislation.[2]

The majority applies this court's decision in **Crockett** broadly to hold that the legislature's authority under Article V, § 32 includes the authority to eliminate the judicial seats. But the majority's ruling in **Crockett** was limited to the office of Clerk of Court for Orleans Parish. The elimination of a judicial seat was not before

---

[2] The state took the position that Prof. Hargrave later changed his opinion after this court's rulings in **Davenport** and **Francois**. However, Prof. Hargrave maintained that Article V, § 32 governed the structure of the Orleans Parish court system, and how it could be merged in the future: "In effect, the Orleans district is being served by one district court that is by constitutional provision continued as separate civil and criminal divisions until merged by an act of the legislature." Lee Hargrave, *The Louisiana State Constitution: A Reference Guide* (1991), p. 91. Prof. Hargrave stated further:

> Other than [Article V, § 32], the constitution does not contain provisions unique to the Orleans district courts. This approach is quite different from the 1921 Constitution, which contained several sections devoted to establishing detailed rules for the Orleans courts that were often different from those applicable to the rest of the state.

*Id.* at 92. Prof. Hargrave recognized that the framers at the 1973 Constitutional Convention had intended to make the Orleans Parish judicial districts subject to the same rules as the other judicial districts of the state, and that no other provision of the constitution other than Article V, § 32 contained language specific to the Orleans Parish judicial districts. The state argued that **Davenport** and **Francois** "confirmed that the enumerated Orleans Parish courts and offices remained subject to ordinary majority legislation," and that this court's decision in **Crockett** reiterates this principle. However, **Crockett** only cited to *dicta* from **Davenport** and **Francois** with respect to the present case. The **Crockett** majority ignored another constitutional provision regarding the right to vote, effectively stripping the citizens of Orleans Parish of that right. To the extent that the two constitutional articles could be at odds with one another, more specific rules prevail over the more general. See **Champagne v. Ward**, 03-3211 (La. 1/19/05), 893 So.2d 773, 780. In the present case, Article V, § 15(D) is clearly specific toward the manner in which judge seats are added and removed from judicial districts, and Article V, § 32 is less specific.

this court in that case, and **Crockett** was absolutely silent with respect to Orleans Parish judges and their seats, and it was silent as to Article V, § 15(D). Article V, § 15(D) does not exclude Orleans Parish. It is a statewide provision designed to shield judges from the adversity of public opinion. The majority's ruling in **Crockett** with respect to Article V, § 32 cannot and does not erase or eradicate Article V, § 15(D). Article V, § 15(D) allows the number of judge seats in *any* of Louisiana's judicial districts to be modified, but only by an act passed by at least a two-thirds majority vote in both houses of the legislature. To apply this court's decision in **Crockett** to the current issue before the court leads to an absurd result where Orleans Parish judges are afforded less constitutional protection than all other judges in Louisiana.

The legislature does have the power to "change by law" the court system of Orleans Parish, but a "law" in the form of a constitutional provision requiring a two-thirds vote to change the number of judges already exists in Article V, § 15(D). Thus, any reference to "change by law" in Article V, § 32 relative to the legislature's power to change the number of judges would require a change to Article V, § 15(D).

Article V, § 15(D) clearly states that "[t]he Legislature may change the number of judges *in any judicial district* by law enacted by *two-thirds* of the elected members of each house." (Emphasis added.) When a law is clear and unambiguous and its application does not lead to absurd consequences, the law shall be applied as written. La. C.C. art. 9. The phrase "in any judicial district" can only mean that the two judicial districts of Orleans Parish fall under Article V, § 15(D), and that the number of judges in those judicial districts may change only with a two-thirds majority in both houses of the legislature. Addition or removal of judge seats cannot ever occur in *any* judicial district of our state by a simple majority vote. To

6

find that the Orleans Parish judicial districts are not protected by Article V, § 15(D), while all other judicial districts in the state of Louisiana receive the protection of a supermajority, is that kind of absurd consequence contemplated by La. C.C. art. 9.

The majority's holding undermines all arguments made in the last legislative session by proponents of the charge that the Orleans Parish judicial districts need to be treated like all others. The battle cry in the legislature was "Orleans must be like the rest of the state," but the majority decision unnecessarily makes Orleans Parish unlike the rest of the state when it comes to how judicial seats are terminated. If the plain goal is to treat the Orleans Parish judiciary as all other judiciaries in this state are treated, a two-thirds majority vote must apply to all judicial districts in order for the number of judges to be altered.

The legislative elimination of these judicial seats does not create the same problem that arose in **Crockett**—that is, Judge Fuller will be able to serve out his term until the end of the year, at which time his office will be abolished pursuant to Act 748.[3] Although it may be considered a more fair result that Judge Fuller is not abruptly deprived of the office to which he was elected, this is a distinction without a difference. Whether there is wisdom in reducing the number of divisions in Orleans Parish Criminal District Court is not before us. The constitutionality of the manner in which the state seeks to reduce that number is before us, and that manner did not follow the clear and plain language of Article V, § 15(D). While the legislature has the absolute power to enact legislation, that power is still limited by

---

[3] In **Crockett**, the enacted legislation abolished the office of Clerk of Criminal District Court shortly after the duly elected candidate took office, thereby stripping the people of Orleans Parish of their right to vote and to have their votes given effect. In my dissent, I stated that the Legislature "undoubtedly has the right" to abolish the office of Clerk of Orleans Parish Criminal District Court pursuant to Article V, § 32, but that the abolition was required to take effect prospectively. See **Crockett v. State,** 26-0594, p. 1 (La. 6/1/26), ___ So.3d ___, 2026 WL 1599484 (Weimer, C.J., dissenting).

7

constitutional provisions.  See **City of New Orleans v. Louisiana Assessors'**
**Retirement and Relief Fund**, 05-2548, p. 24 (La. 10/1/07), 986 So.2d 1, 19.[4]

This matter was granted and docketed because it involved a strictly legal question of constitutional interpretation.  There are no facts which need to be developed and the record is complete, public, and undisputed, making a trial on the merits unnecessary.  The issue concerns a court that handles one of the busiest criminal dockets in the state, impacting public safety and the economy of both the city of New Orleans and the state of Louisiana as a whole.  This court sits on the pinnacle of the state's judicial hierarchy and decisions of the Supreme Court represent the final say.  For these reasons, oral argument would have been beneficial.  Decades ago, this court voted to allow oral arguments to be broadcast over the worldwide web via a simple click on this court's website.  This effort at transparency is important for the people that are served by the court and for the litigants in our system of justice.  Allowing open oral argument in a case of this magnitude of importance, which addresses legislative, judicial and constitutional issues would serve those goals.  Without transparency, the public is often left to question whether the judiciary is operating efficiently, effectively, and impartially.

It is disappointing that the majority of this court goes out of its way to rule that a limited number of judges will be subject to elimination by a mere majority vote of the legislature, thereby adversely impacting judicial independence.  This matter resonates far beyond this case and does not simply affect how many judges should serve in a given district.  Judicial independence helps establish the balance

---

[4] To be clear, in dissenting I do not find that Act 748 is wholly unconstitutional as that question is not before this court.  I do find Act 748 unconstitutional insofar as it purports to abolish three judge seats in Orleans Parish Criminal District Court because it did not receive the requisite supermajority vote of two thirds from both legislative houses.

8

between the three branches of government. It shields the judiciary from political influence and creates job security for judges. The requirement of a supermajority to add or remove judges requires agreement between opposing political factions and guards against hasty or emotional decisions by lawmakers. If this court does not maintain judicial independence and the essential components thereof, which include impartiality and integrity, there is no other branch of the government that will.

The concept of separation of powers is not new to this country, nor should it be politicized. It was a cornerstone in the founding of our nation, and it fostered the independent and unbiased posture of the judicial system. It brought about public trust and confidence in our court system. Separation of powers is fundamental to the fair and impartial administration of justice. It is intricately balanced among the three branches of government, and this court must protect that balance to ensure that it is maintained.

Finding that the portion of Act 748 which eliminated three judicial seats in Orleans Criminal District Court is unconstitutional because its passage violated Louisiana Constitution art. V, § 15(D), I respectfully dissent.

# SUPREME COURT OF LOUISIANA

## No. 2026-CD-00927

## JOHN T. FULLER

## VS.

## STATE OF LOUISIANA; JEFF LANDRY IN HIS OFFICIAL CAPACITY AS GOVERNOR; ELIZABETH B. MURRILL, IN HER OFFICIAL CAPACITY AS ATTORNEY GENERAL; NANCY LANDRY, IN HER OFFICIAL CAPACITY AS SECRETARY OF STATE; AND CHELSEY RICHARD NAPOLEON, IN HER OFFICIAL CAPACITY AS CLERK OF COURT FOR THE PARISH OF ORLEANS

On Supervisory Writ to the 19th Judicial District Court,
Parish of East Baton Rouge

**McCALLUM, J., additionally concurs and assigns reasons.**

The resolution of this case depends in no small part on the interpretation of Louisiana Constitution Article V, Section 32. The first step in understanding a constitutional text is to simply read it. "The sources of law are legislation and custom." La. C.C. art. 1. "Legislation is a solemn expression of legislative will." La. C.C. art. 2. "When a law is clear and unambiguous and its application does not lead to absurd consequences, the law shall be applied as written *and no further interpretation may be made in search of the intent of the legislature.*" La. C.C. art. 9. (Emphasis added). "The words of a law must be given their generally prevailing meaning. Words of art and technical terms must be given their technical meaning when the law involves a technical matter." La. C.C. art. 11. "The Louisiana Constitution is generally interpreted using the same methods as statutes and other written instruments." *State v. Breaux*, 2024-00737 p. 4 (La. 5/9/25), 408 So. 3d 899, 903.

The dissent ignores these directives and resorts to transcripts of delegate discussions and committee recommendations contained in the Records of the

Constitutional Convention, as well as statements made by the "Coordinator of Legal Research at the Convention" to discern a constitutional equivalent to legislative intent. This is, in my view, a mistake and it is unnecessary.

As noted by the majority, the text, as passed by the delegates in convention, and then ratified by the citizens of this state, is unambiguous. The analysis should end there. A review of the opinions of various delegates and committee members, and even the "Coordinator of Legal Research at the Convention," cannot override the meaning of the clear language of a constitutional provision. Reasoning *a fortiori*, a constitutional provision, like Section 32, is a direct expression of the people's will and its interpretation should not vary based on the opinions of those merely tangentially connected to the convention.

Justice Scalia wrote extensively on the practice of using legislative history to interpret laws. In disagreeing with the majority's reliance on the legislature's silence when considering a legislative act, Justice Scalia wrote the following:

> There are two things wrong with this. First is the notion that Congress cannot be credited with having achieved anything of major importance by simply saying it, in ordinary language, in the text of a statute, "without comment" in the legislative history. As the Court colorfully puts it, if the dog of legislative history has not barked nothing of great significance can have transpired. Apart from the questionable wisdom of assuming that dogs will bark when something important is happening, we have forcefully and explicitly rejected the Conan Doyle approach to statutory construction in the past. *See Harrison v. PPG Industries, Inc.*, 446 U.S. 578, 592, 100 S.Ct. 1889, 1897, 64 L.Ed.2d 525 (1980) ("In ascertaining the meaning of a statute, a court cannot, in the manner of Sherlock Holmes, pursue the theory of the dog that did not bark"). We are here to apply the statute, not legislative history, and certainly not the absence of legislative history. Statutes are the law though sleeping dogs lie.

*Chisom v. Roemer*, 501 U.S. 380, 406, 111 S. Ct. 2354, 2370, 115 L. Ed. 2d 348 (1991) (Scalia, J., dissenting) (some internal citations omitted). Even when he agreed with the outcome of a decision, Justice Scalia disapproved of the Court's reliance on legislative history in the majority's reasoning, even when the majority ultimately found the legislative history unconvincing:

2

I agree with the Court's opinion, except that portion of it which enters into a discussion of "[t]he drafting history of § 4010." In my view a law means what its text most appropriately conveys, whatever the Congress that enacted it might have "intended." The law is what the law says, and we should content ourselves with reading it rather than psychoanalyzing those who enacted it.

…

Our opinions using legislative history are often curiously casual, sometimes even careless, in their analysis of what "intent" the legislative history shows. Perhaps that is because legislative history is in any event a makeweight; the Court really makes up its mind on the basis of other factors. Or perhaps it is simply hard to maintain a rigorously analytical attitude, when the point of departure for the inquiry is the fairyland in which legislative history reflects what was in "the Congress's mind."

…

The text's the thing. We should therefore ignore drafting history without discussing it, instead of after discussing it.

*Bank One Chicago, N.A. v. Midwest Bank & Tr. Co*., 516 U.S. 264, 279-83, 116 S.

Ct. 637, 645-47, 133 L. Ed. 2d 635 (1996) (Scalia, J., concurring) (internal citations

omitted).

Decades before, Justice Robert Jackson also expressed a similar view, writing:

I should concur in this result more readily if the Court could reach it by analysis of the statute instead of by psychoanalysis of Congress. When we decide from legislative history, including statements of witnesses at hearings, what Congress probably had in mind, we must put ourselves in the place of a majority of Congressmen and act according to the impression we think this history should have made on them. Never having been a Congressman, I am handicapped in that weird endeavor. That process seems to me not interpretation of a statute but creation of a statute.

…

Legislative history here as usual is more vague than the statute we are called upon to interpret.

*United States v. Pub. Utilities Comm'n of Cal*., 345 U.S. 295, 319-21, 73 S. Ct. 706,

719-20, 97 L. Ed. 1020 (1953) (Jackson, J., concurring) (internal citations omitted).

Louisiana courts have likewise rejected the use of legislative history when a

law is clear and unambiguous:

[C]ourts should never resort to considering "legislative history" when a clear and unambiguous statute is under attack. It is the act of the Legislature which we must consider, not the statements of lobbyists, special interest groups, or even the policy or the wisdom of legislators themselves.

*Needom v. Robein*, 2008-0318 p. 10 (La. App. 4 Cir. 2/18/09), 7 So. 3d 30, 36.

The dissents also indicate that "the majority decision unnecessarily makes Orleans Parish unlike the rest of the state when it comes to how judicial seats are terminated" and that the Orleans Parish courts should be treated like any other courts. That position is incompatible with the dissent's own acknowledgment that Orleans Parish is unique among parishes in having separate courts for its civil and criminal divisions.

The majority correctly finds the constitutional provisions at issue to be clear and unambiguous, and correctly applies them as written. The use of a labyrinthine equivalent of legislative history to essentially alter the meaning and interpretation of unambiguous constitutional provisions is unnecessary and unwarranted.

JOHN T. FULLER

VS.

STATE OF LOUISIANA; JEFF LANDRY IN HIS OFFICIAL CAPACITY AS GOVERNOR; ELIZABETH B. MURRILL, IN HER OFFICIAL CAPACITY AS ATTORNEY GENERAL; NANCY LANDRY, IN HER OFFICIAL CAPACITY AS SECRETARY OF STATE; AND CHELSEY RICHARD NAPOLEON, IN HER OFFICIAL CAPACITY AS CLERK OF COURT FOR THE PARISH OF ORLEANS

*On Supervisory Writ to the 19th Judicial District Court, Parish of East Baton Rouge*

**GRIFFIN, J., dissents and assigns reasons.**

Mere weeks after denying the right to vote to hundreds of thousands of New Orleans citizens, the majority violates every method of interpretation it has used for two hundred years to tell New Orleans that it would be better off not being a part of Louisiana. The majority ignores the *express* words of the author of the two constitutional provisions at issue, ignores the *express* words of the other Delegates to our Constitution, ignores the *express* text of the Constitution, and ignores the *express* words of the Coordinator for Legal Research at the Constitutional Convention, on whom this Court has relied for *fifty* years. There is no rational legal basis for the majority opinion.

For nearly two centuries, the Louisiana Constitution has been interpreted using the same methods as our Civil Code and other legal instruments. *See* Justice Piper D. Griffin and Dr. Derek Warden, *Interpreting the Louisiana Constitution*, 72 Loy. L. Rev. 193, 196 (2026) (collecting sources back to 1843). All interpretations of the law begin with its text. La. C.C. arts. 1, 2, 9; *Canal/Claiborne, Ltd. v. Stonehedge Dev., LLC*, 14-664, p. 5 (La. 12/9/14), 156 So. 3d 627, 632.

Article V §15(D) states, "The legislature may change the number of judges in any judicial district by law enacted by two-thirds of the elected members of each house." On the other hand, §32 states:

> Except for provisions relating to terms of office as provided elsewhere in this Article, and notwithstanding any other contrary provision of this constitution, the following courts and officers in Orleans Parish are continued, subject to change by law; the civil and criminal district courts; the city, municipal, traffic, and juvenile courts; the clerks of the civil and criminal district courts; the civil and criminal sheriffs; the constables and the clerks of the first and second city courts; the register of conveyances; and the recorder of mortgages.

While the Framers removed an explicit "majority vote" from §32, I believe that "by law" means a standard majority legislative vote. It is clear majority vote is still the standard.[1]

However, despite this "change by law" or the "notwithstanding" language, the result does not change, as the power to alter the number of judges in a district court is not part of §32. Section 32 does not mention changing the number of judges. Section 15(D) does. Thus, §15(D), as the more specific provision to the situation at hand, should control. *See Lowther v. Town of Bastrop*, 20-01231, p. 4 (La. 5/13/21), 320 So.3d 369, 373. This textualist perspective is supported by the Coordinator for Legal Research at the Convention, who agreed that the "civil and criminal district courts" in §32 was only a power over their separate existence "*vel*

---

[1] Section 32 once had a generally applicable "two-thirds" and a "referendum" requirement. These were removed within the same discussion. Records of the Louisiana Constitutional Convention of 1973, Transcript Records, volume VI, pp. 952 - 959, August 24, 1973, 36th Day of the Proceeding. The amendment with "majority vote" language was adopted on p. 958-959. *See also* Records of the Louisiana Constitutional Convention of 1973, Journal of the Proceeding, volume I, p. 100 (Journal page 17), July 6th, 1973, 11th Day of the Proceeding; and *Id*. at pp. 379 – 80 (Journal pages 7-9), August 24th, 36th Day of the Proceedings; Records of the Louisiana Constitutional Convention of 1973, Committee Documents, volume XI, p. 272, August 2nd, 1973 (non-proceeding). The removal of "majority vote" was a committee recommendation. Records of the Louisiana Constitutional Convention of 1973, Committee Documents, volume XIV(A), pp. 775 and 780-81. Justice Tate stated that the changes were grammatical, not substantive, and he noted the difference between "by law" and "two thirds." Records of the Louisiana Constitutional Convention of 1973, Transcript Records, volume IX, pp 3239 and 3244, January 9th, 1974, 113th Day of the Proceedings. That was the final version we have today.

*non.*" Lee Hargrave, *The Judiciary Article of the Louisiana Constitution of 1974*, 37 LA. L. REV. 765, 780-81 (1977). The State tries to counter this "vel non" statement by saying Professor Hargrave distanced himself from it later. Yet, I found no such rejection or reasoning for it; and it would be absurd to accept a decades' later statement over a detailed analysis made within the Convention's immediate shadow. The State does not, however, attempt to reject the rest of the quotes and statements from Professor Hargrave mentioned herein.

The only thing that §32 did was carry the old Orleans court system forward but allowed the legislature to change it according to the same plenary power and §15 exceptions and exemptions applicable to similarly situated courts and offices around the state. Otherwise (as the majority now holds) the legislature could decrease *or* increase (with the added financial burden) the number of district judges in Orleans Parish without the protections afforded to other district courts. This inequality undermines the major intentions and purposes of these provisions and should be avoided. La. C.C. art. 9, *McLane S., Inc. v. Bridges*, 11-1141, pp 8–9 (La. 1/24/12), 84 So. 3d 479, 485. To quote Professor Hargrave:

> [T]he grant of power to the legislature "to change by law" relates to change in the continuation of the existence of the separate courts, and not a general legislative power to change all aspects of the Orleans district courts.
>
> …
>
> In this way, Section 32, can be seen as a specific exception to a uniform district court structure to preserve separate criminal and civil district courts in Orleans as separate courts; in other matters, the Orleans district courts are to be organized and treated uniformly with the other district courts of the state. To conclude otherwise would be inconsistent with the general purpose of the convention of establishing as much uniformity as possible within the court structure throughout the state; the policy of preventing substantial legislative change of the constitutional structure; and the policy of requiring supermajority votes to effectuate most of those changes in district court structure that are allowed. *Id*. at 780-81.[2]

---

[2] This Court has continually cited Professor Hargrave in its §32 and Article V jurisprudence. *See e.g., Crockett v. State*, 26-0594, p.5 (La. 6/1/26), reh'g denied, 2026-00594 (La. 6/26/26); *In re Matthews*, 2021-01078 (La. 1/28/22), 333 So. 3d 422, 425; *State v. Francois*, 445 So. 2d 416, 418 (La. 1983) (citing the pages listed above).

3

The debates surrounding §32 show it was not intended to defeat §15(D) or have New Orleans treated with less protection than other districts. Delegate Juneau, who was responsible for §32 as we have it today, removed the explicit and generally applicable two-thirds requirement of §32 and added the explicit legislative "majority vote." By his own words, it protected Orleans from immediate change, and "it gives equality and it's consistent with the previous votes of this convention." Records of the Louisiana Constitutional Convention of 1973, Transcript Records, volume VI, p. 958, August 24, 1973, 36th Day of the Proceeding. His "previous votes" statement referenced §15, which included his own proposal that became §15(D), the very section disputed here. Indeed, the focus of the §32 debate was preventing injury from immediate change in Orleans Parish, allowing change, and ensuring Orleans Parish was treated equally with the rest of the state in regard to changing its courts, with §15 being the frequently cited benchmark. *Id.* at pp. 952 – 959. Delegate Jack supported Delegate Juneau's view and stated "[i]t's time New Orleans was governed by the same laws as the rest of the state." *Id.* at 955-56. When the Delegates mentioned "majority vote," it was always in the context of saying what's good for one is good for all. *Id.* at 952-959. While some argued for more protection for Orleans Parish, the majority believed it should have the same; *but no one believed it should have less.*

The history of §15(D) confirms it protects Orleans Parish. Delegate Juneau, also proposed and defended §15(D) and stated that §15(D) would apply to any parish "whatever parish it may be," and that it was based on Article VII §34 of the 1921 Constitution.[3] Records of the Louisiana Constitutional Convention of 1973, Transcript Records, volume VI, p. 795, August 17th, 1973, 32nd Day of the Proceeding. Importantly, the 1921 Constitution excluded Orleans from other

---

[3] "The Legislature may rearrange the judicial districts, and by a two-thirds vote of the membership of each house, may increase or decrease the number of judges in any district."

4

district courts' protections, giving it special ones. 1921 La. Const. Art. VII §§ 31, 80 – 87. These were all removed from the current constitution and all attempts to exclude Orleans Parish from §15 were defeated. Records of the Louisiana Constitutional Convention of 1973, Transcript Records, volume VI, p. 786 – 789, August 17th, 32nd Day of the Proceedings; *and see* Hargrave, *supra* at 779. Thus, New Orleans was to be protected by §15 (D).

The Delegate responsible for §§ 15 and 32 as we have them today told us what he meant, his fellow Delegates agreed, and the Coordinator for Legal Research, on whom this Court has relied for fifty years, also agreed: Section 32 is neither a shield for New Orleans nor a sword for the legislature; but, it is a set of juridical training wheels to get New Orleans up to the rest of the state according to the same rules applicable to similarly situated courts under the legislature's general plenary power over such courts with the same constitutional limitations. The power over the number of district judges is simply not within §32. The ratifiers, no doubt, agreed as well. *See* E.L. Henry, *Creating and Organizing CC 73*, 62 LA. L. REV. 29, 36 (2001) (noting openness of the Convention); Public Affairs Research Council Voter's Guide to the Proposed Constitution, p. 14-15 (1974) (treating New Orleans and other state courts similarly in the same bullet point). None of the jurisprudence on §32 is to the contrary. Those cases focus on New Orleans claiming special protection that it does not have. Here, the city accepts equality.

*Crockett* is not implicated, as §32 simply does not contain any power over the number of district judges. That is the prerogative of §15(D). For all branches of government, including this Court, "[e]ven plenary power is subject to constitutional limitations." Bradley C. Guin, *Louisiana Writ Practice: An Examination of Supervisory Jurisdiction*, 86 LA. L. REV. 1045, 1062 (2026); *Bd. of Comm'rs of Orleans Levee Dist. v. Dep't of Nat. Res.*, 496 So. 2d 281, 286 (La. 1986). In accepting the State's argument that none of §15 applies, the majority

5

allows the legislature to merge Orleans district courts with any other judicial district without any referendum in either jurisdiction as would be required under §15(B), a proposition that Professor Hargrave and the other Framers rejected. Hargrave, *supra,* at 780, n. 70; Records of the Louisiana Constitutional Convention of 1973, Transcript Records, volume VI, p. 957-58, August 24, 1973, 36th Day of the Proceeding (Discussion between Delegates Casey, Abraham, Avant, Dennis, Juneau, and Chairman Henry)(literally confirming that §15(B) applies to Orleans district courts). Further, it jeopardizes all felony convictions that have taken place in Orleans Parish. If the Criminal District Court is not subject to any other parts of Article V, then it was never a properly constituted district court with felony jurisdiction under §16.

Act 748 failed to gain the necessary votes as required by §15(D) and is therefore unconstitutional to the extent it reduced the number of district judges in Orleans Criminal District Court.  In holding otherwise, the majority makes clear that New Orleans is not "part of" but "subordinate to" Louisiana. This violates our Constitution's goals. Until today, we were one State, with one Constitution—one unitary organic law for all Louisianians. *See* Records of the Louisiana Constitutional Convention of 1973, Journal of the Proceeding at volume I, pages 79-80 (Journal page 2-3), July 5th, 1973, 10th Day of the Proceeding (Statement by Chairman Henry).

I dissent.

# SUPREME COURT OF LOUISIANA

## No. 2026-CD-00927

## JOHN T. FULLER

## VS.

## STATE OF LOUISIANA; JEFF LANDRY IN HIS OFFICIAL CAPACITY AS GOVERNOR; ELIZABETH B. MURRILL, IN HER OFFICIAL CAPACITY AS ATTORNEY GENERAL; NANCY LANDRY, IN HER OFFICIAL CAPACITY AS SECRETARY OF STATE; AND CHELSEY RICHARD NAPOLEON, IN HER OFFICIAL CAPACITY AS CLERK OF COURT FOR THE PARISH OF ORLEANS

On Supervisory Writ to the 19th Judicial District Court, Parish of East Baton Rouge

**GUIDRY, J., dissents and assigns reasons.**

It has been said that New Orleans should not be treated "special." I agree that Orleans Parish should not be treated better than other parishes of this state, but I emphatically reject the proposition that the Louisiana Constitution allows it to be treated worse than other parishes. There seems to be an emerging pattern of disenfranchising the citizens of Orleans Parish and treating them less than the citizens of every other parish of our state. As justices on the highest court of this state, we are duty bound by the Constitution and morally obligated by the oaths we swore to rectify this disparate treatment. The majority herein disregards the norms of constitutional analysis and, in a result-oriented approach, fails to vindicate the rule of the law in this instance.

This case presents the fundamental question of whether our state Constitution allows for the reduction of judgeships in Orleans Parish by a simple majority vote but requires a supermajority vote of two-thirds of the elected members of both houses of the legislature to reduce judgeships in every other parish of this state. I think our Constitution is clear that as it relates to the reduction of judgeships, so goes

1

the rest of the state, so should go New Orleans in requiring a two-thirds majority vote to reduce judgeships in any parish of this state. The majority errs by conflating the issue of structure of courts and the number of judgeships assigned to those courts. The specific issue presented here is not court structure, but the constitutionally required vote necessary to change the number of judges that are assigned to those courts. This important distinction is made clear in the relevant provisions of the Constitution that when read *in pari materia*, clarifies that the provisions on structure and the more specific provision relative to changing the number of judgeships are not contradictory but are easily harmonized. The plain language of the Constitution, the records of the constitutional convention, and the most authoritative scholarly writings on this matter leave no doubt that to change the number of judgeships in Orleans Parish or in any parish of this state requires a two-thirds vote and therefore, Act 748, having failed to receive that two-thirds vote, is blatantly unconstitutional.

> Louisiana Constitution article V, section 32 provides:
>
> Except for provisions relating to terms of office as provided elsewhere in this Article,[1] and notwithstanding any other contrary provision of this constitution, the following **courts** and **officers** in Orleans Parish are continued, subject to change by law; the civil and criminal district courts; the city, municipal, traffic, and juvenile courts; the clerks of the civil and criminal district courts; the civil and criminal sheriffs; the constables and the clerks of the first and second city courts; the register of conveyances; and the recorder of mortgages. [Emphasis added.]

Section 32 expressly lists the following *courts*: civil district court, criminal district court, city court, municipal court, traffic court and juvenile court of Orleans Parish. Likewise, Section 32 expressly lists the following *officers*: the clerks of the civil and criminal district courts, the civil and criminal sheriffs, the constables and clerks of the first and second city courts; the register of the conveyances; and the recorder of mortgages. While the term "officer" of necessity encompasses the office occupied

---

[1] Despite the <u>Crockett</u> opinion's singular reference to La. Const. art. V, § 21, there are additional sections of Article V that likewise address "terms of office." <u>See</u> La. Const. art. V, §§ 3, 8(C), 15(C), 27, 28, and 31.

by the officer,[2] it does not follow that the reference to specific judicial officers and to specific courts in Section 32 thereby includes judicial officers that are not mentioned, such as judges.

The Orleans Parish courts and officers to which Section 32 applies are clearly and unambiguously listed. There is nothing in Section 32 that would indicate that the list of courts and officers is not exclusive. There are no terms or language included in Section 32 to indicate that the list of courts and officers may also include other courts or officers not listed. Thus, it is quite telling that judges are not included in the Section 32 listing. Thus, I stand by my statement made in dissent to the Crockett opinion that "clearly Section 32 of Article V allows the legislature to change the basic structure of the *courts* and *officers* **listed** therein." Crockett v. State, 26-00594, p. 5 (La. 6/1/26), ___ So. 3d ____, ____, 2026 WL 1599484 at *17 (emphasis added).

As judges are not listed, I respectfully dissent from any ruling holding that Section 32 overrides the constitutional mandates of La. Const. art. V, § 15, and more specifically, Section 15(D), which provides that "[t]he legislature may change the number of judges in any judicial district by law enacted by two-thirds of the elected members of each house." While Section 15(D) provides for the manner "by law" in which the number of judges in a judicial district may be changed, as explained by Lee Hargrave in his book, The Louisiana Constitution: A Reference Guide,[3] Section

_____

[2] In her opposition brief, the attorney general repeatedly uses the term "office" rather than "officers" in her arguments to this court, seemingly relying on the Crockett opinion's use of the term "offices" rather than "officers" in discussing the history of Section 32. See Crockett v. State, 26-00594, pp. 4-5 (La. 6/1/26), ___ So. 3d ____, ____,2026 WL 1599484 at *3. The Crockett opinion cites to and quotes in part portions of a reference guide on the Louisiana Constitution written by Lee Hargrave. The portions of the actual text referred to and quoted in Crockett solely mention "courts" and make absolutely no reference to "office" or "officers," as shown later in this dissenting opinion. Hence, the Crockett opinion expands on what the text actually states by indicating that the text referred to "offices."

[3] Lee Hargrave, The Louisiana Constitution: A Reference Guide, 91-92 (G. Alan Tarr, series ed., Greenwood Press 1991).

32 was enacted to primarily provide for changes in the structure of the Orleans Parish courts. As Professor Hargrave explained:

> Section 16 [of Article V of the Louisiana Constitution] provides the jurisdiction of all the district courts, making no exception for Orleans Parish, where separate criminal and civil district courts have long existed. This section [Section 32], however, does continue the existence of the separate criminal and civil district courts until merged by law. In effect, the Orleans district is being served by one district court that is by constitutional provision continued as separate civil and criminal divisions until merged by an act of the legislature.
>
> Organization of the Orleans courts was the issue that occupied the most time in the Judiciary Committee and provoked the most controversy during the 1973 convention. To placate the Orleans interests, the committee did not urge merger and in fact proposed making merger quite difficult by requiring approval of the legislature and a referendum in Orleans Parish. The convention would not give such strong protection to the status quo. It rejected the committee proposal, first in favor of requiring a two-thirds vote to change the existing Orleans courts and then in favor of permitting change simply by law, meaning the normal legislative majority vote. The legislature's power in this regard was upheld in *State v. Francois* (1983), in which the criminal court was required to take jurisdiction of the "civil" commitment under the mental health laws of a person acquitted of a crime because of insanity.
>
> The convention's action reflected dissatisfaction with the nonuniform structure of Orleans courts. That dissatisfaction was also reflected in the reduction of the term of Orleans district judges from twelve to six years, thus giving them the same terms as the district judges serving the rest of the state. Other than section 32, the constitution does not contain provisions unique to the Orleans district courts. This approach is quite different from the 1921 Constitution, which contained several sections devoted to establishing detailed rules for the Orleans courts that were often different from those applicable to the rest of the state.[4]

Hence, there is no basis in the convention history for holding that Section 32 exempts the legislature from complying with Section 15(D).

---

[4] As initially noted by Professor Hargrave in discussing the Article V of the Louisiana Constitution regarding the Judicial Branch:

> Although the constitution does allow much legislative flexibility in abolishing or merging ... lower courts and allows their continuation until legislative action, ... [t]he policy the committee recommended, and the convention accepted, was to allow the legislature to move to a uniform three-tiered or four-tiered court system.

This likewise illustrates that the authority granted the legislature to act pursuant to Section 32 is with respect to the structure of Orleans Parish courts rather than with respect to the creation or elimination of judgeships.

Moreover, La. Const. art. V, § 32 provides in relevant part that "notwithstanding any other contrary provision of this Constitution," the criminal district court in Orleans Parish is subject to change by law. The word "contrary" as an adjective modifying the word "provision" is defined as "being so different as to be at opposite extremes: opposite" and "being not in conformity with what is usual or expected."[5] The usual and expected practice for changing the number of judges in a judicial district is contained in La. Const. art. V, § 15(D), which provides "[t]he legislature may change the number of judges in any judicial district by law enacted by two-thirds of the elected members of each house." This provision is consistent with La. Const. art. V, § 32, as both provisions provide that the Orleans Criminal District Court can be changed—with the change in this case being a reduction in the number of divisions or judges on the court—by law. While Section 32 *generally* provides for a change by legislative enactment, Section 15(D) *specifically* provides for a change by legislative enactment made by two-thirds of the elected members of each house.

As there has been no showing of a different practice for changing the number of judgeships in a judicial district, there is no basis for holding that Section 32 exempts the legislature from complying with Section 15(D) in enacting legislation that changes the number of judgeships on the Orleans Criminal District Court.

Requiring that the change in the number of judgeships in the Orleans Criminal District Court be made by a two-thirds vote of the elected members of each house allows New Orleans to be treated like every other parish in the state. Not only is this consistent with the plain language of our state Constitution, the record of the proceedings giving rise to the enactment of that Constitution, and authoritative scholarly treatment thereof, but it is also consistent with traditional notions of

---

[5] Merriam-Webster.com Dictionary, https://www.merriam-webster.com/dictionary/contrary. Accessed 7/23/2026.

substantial justice and fair play. To the extent the majority holds to the contrary, I respectfully dissent.

# SUPREME COURT OF LOUISIANA

## No. 2026-CD-00927

## JOHN T. FULLER

## VS.

## STATE OF LOUISIANA; JEFF LANDRY IN HIS OFFICIAL CAPACITY AS GOVERNOR; ELIZABETH B. MURRILL, IN HER OFFICIAL CAPACITY AS ATTORNEY GENERAL; NANCY LANDRY, IN HER OFFICIAL CAPACITY AS SECRETARY OF STATE; AND CHELSEY RICHARD NAPOLEON, IN HER OFFICIAL CAPACITY AS CLERK OF COURT FOR THE PARISH OF ORLEANS

On Supervisory Writ to the 19th Judicial District Court, Parish of East Baton Rouge

**COLE, J., additionally concurs and assigns reasons**:

I agree with the Court's opinion. While these are sensitive matters, we are constrained to apply the specific constitutional provision that is directed at the New Orleans courts. As discussed in the majority opinion, the idea that a sweeping provision concerning blanket legislative authority over a particular court cannot be utilized concerning that court's judges is nonsensical.[1]

There is much discussion in the dissenting opinions about their preference that New Orleans judges should be governed by the same provisions as other courts. Unfortunately, it seems that desire is a one-way street applicable only when beneficial. The Constitution does allow for that, but unless and until that mechanism is utilized, those courts remain subject to La. Const. Art. V, § 32. To place Orleans Parish on the same footing as a Judicial District Court, as it exists in the rest of the state, the legislature has the option to: 1.) further reduce Orleans judgeships to be more in line with those allocated to the remainder of

---

[1] One dissent correctly observes that under our Constitution the jurisdiction of the Orleans Parish courts does not emanate from La. Const. art. V, §16. However, no dire collateral consequences flow from that reality since Section 32 continued the prior jurisdiction "subject to change by law," and the statutory law of Louisiana makes very clear that the "criminal district court for the Parish of Orleans shall have exclusive jurisdiction of the trial and punishment of all crimes, misdemeanors, and offenses committed within the parish of Orleans if the jurisdiction is not vested by law in some other court." R.S. 13:1336(A). There is no gap in the authority for the Orleans Parish courts even if that authority stems from a different legal source.

1

Louisiana, 2.) require Orleans Parish to fund the operations and staffing of its courts like the other parishes, and 3.) merge the civil and criminal district courts together to create a new numbered Judicial District that would fall under the same rules as other judicial districts. A bill was filed this year to do just that, HB 911, but it was opposed more vociferously than the reforms that were ultimately adopted. There are certainly many good policy reasons for not taking those more drastic actions to bring New Orleans into alignment with the rest of the state, but the effect of remaining unique is that the distinct constitutional provision remains applicable.

JOHN T. FULLER

VS.

STATE OF LOUISIANA; JEFF LANDRY IN HIS OFFICIAL CAPACITY AS GOVERNOR; ELIZABETH B. MURRILL, IN HER OFFICIAL CAPACITY AS ATTORNEY GENERAL; NANCY LANDRY, IN HER OFFICIAL CAPACITY AS SECRETARY OF STATE; AND CHELSEY RICHARD NAPOLEON, IN HER OFFICIAL CAPACITY AS CLERK OF COURT FOR THE PARISH OF ORLEANS

**On Supervisory Writ to the 19th Judicial District Court,
Parish of East Baton Rouge**

**Burris, J.,** additionally concurs and assigns reasons.

I agree entirely with the Court's Per Curiam. As a legal matter the underlying dispute here is easily answered by a simple reading of the plain text of La. Const. art. V, § 32. As the majority correctly observes, "notwithstanding any other provision of this constitution" means exactly what it says.

Although not part of the Court's legal consideration, much has been said over the past few months about whether these reforms were fair. As a jurist that plays no role in my decision, but as the Justice elected to our state's highest court from its fastest growing corridor, I feel obligated to bring attention to the reality experienced by the courts within my district.

There is no dispute that New Orleans is a world class host for top tier events, or that it has an exceptional culture and unique role in bringing international focus and attention to Louisiana. A rising tide lifts all boats, and I want every corner of our state to thrive. I highlight the following disparities not as a criticism, but because the over-allocation of resources to some areas increases the likelihood that other areas with acute needs will remain ignored. I am compelled to point out how the growth in the parishes of my district has led to a mismatch in resources.

1

Louisiana Supreme Court District One largely overlaps with the Third District of the First Circuit Court of Appeal, covering the Florida Parishes.[1] According to the most recent U.S. census estimate, those parishes are home to 665,230 Louisianans who elect four appellate judges. If my constituents and the 362,154 people of Orleans Parish were all treated fairly the people of Orleans Parish would elect approximately two appellate judges rather than the ten currently elected by Orleans Parish voters. Even after this year's reforms, the voters in Orleans Parish will still elect eight judges to the appellate court, double the number of judges elected by twice as many people from my district.

I also serve most of the 21st Judicial District and all of the 22nd Judicial District.[2] These two districts are home to 631,185 Louisiana residents. In 2025, a total of 36,162 civil and criminal (non-traffic) cases were filed in those courts, while only 15,759 civil and criminal (non-traffic) cases were filed in Orleans Parish.[3] At first glance a rational observer would assume that with almost double the population and more than double the number of cases, the 21st and 22nd Judicial Districts would together have substantially more district court judges than Orleans Parish. However, even after Act 748, the number of district court judges in Orleans Parish will still surpass the combined number of judges in the overworked courts along the I-12 corridor in my district.

A significant amount of rhetorical flourish and hyperbole concerning Act 748 circulated around what was, by any objective measure, a modest reduction to the Orleans Parish judiciary. I suggest we would all be best served by focusing on the facts. New Orleans retains more judges than any other place in Louisiana. It will

---

[1] The Third District includes the parishes of East Feliciana, Livingston, St. Helena, St. Tammany, Tangipahoa, Washington, and West Feliciana.
[2] The 21st Judicial District consists of Livingston, St. Helena and Tangipahoa Parishes. Washington and St. Tammany Parishes comprise the 22nd Judicial District.
[3] See the Supreme Court of Louisiana Annual Report of the Judicial Council of the Supreme Court at https://www.lasc.org/press_room/annual_reports/reports/2025_Annual_Report.pdf.

have more, not less, of its share of judicial resources by any metric. The uniqueness and potential excesses of the Orleans Parish court system prompted an equally unique constitutional provision specifically governing those courts. By ratifying Article V, § 32 of the 1974 Constitution, the people of Louisiana reserved to the legislature the authority to "change by law . . . the civil and criminal district courts" in Orleans Parish. Act 748 is a proper and reasonable exercise of that authority.